The court is looking at me because I'm speaking in a foreign language and obviously if there's not a translator here to tell us what that is, I might as well not be present at this proceedings because I'm not going to make any sense to the court. I have a pretty good idea of what you're saying. Do you speak more like Heath, Judge? What did you say? Do you speak more like Heath, Judge? That's a language from the South Pacific. Well, to make the analogy apt, if Judge Kleinfeld understood what you were saying and corrected your interpretation of it, it would be more like what we're talking about here, wouldn't it? Yes, Your Honor. Okay. So, I mean, the substance of this case is there's, I think, three overlapping issues and one is the obviously the interpreter issue. That relates, I think, because it's a specific foreign language, to the prostitute misconduct issue on injecting the Hmong race into this. I've got a problem with the language thing. Not all foreigners are unable to speak English. That's correct. It's kind of like Latin was 2,000 years ago. A lot of people speak it in all parts of the earth. So it seems like a trial judge has to make some sort of judgment. Using interpreters at a trial is somewhat disruptive and delaying. A trial judge has to make some sort of judgment. Initially, he gave the fellow an interpreter, and then after a while, after quite a lot of experience with Vang, he thought, this is phony. It's obvious that Vang does not need an interpreter. He understands English. What I'm wondering is what shows that the trial judge's determination was not one to which we have to defer under AEDPA. Well, Your Honor, okay, two things I think tell us that you don't defer to that. Number one, I believe this happened, this came up right after jury board here, as I understand it, from the record. So there was some, obviously, some time that the judge was seeing that whether or not the interpreter was talking to Mr. Vang or not maybe brought up an issue. But there's two points here. One, when this issue came up, one counsel told the judge, look, he doesn't understand me. I have a hard time communicating with him. This is a serious Sixth Amendment issue. If counsel is sitting there through a capital – this is a death penalty case. Through a capital trial and he cannot communicate with his client, how is Mr. Vang getting the right to effective assistance to counsel in this situation? He didn't get a death penalty, right? He did not. Now, the second counsel got up, the co-counsel there, because the judge had observed, well, I see you having these long conversations with Mr. Vang, and so obviously you guys are communicating, and that counsel responded, no, Judge, we're not. The problem is, is we're having these long conversations because Mr. Vang cannot form sentences in English, and we have to have this long, drawn-out thing to make him understand what's going on. And the real problem with that is this. If the co-counsel and Mr. Vang are having these long, drawn-out conversations in the midst of trial, just so because they can't communicate, how is Mr. Vang present at the trial there? Because trials don't stop while they're having this conversation. Witnesses are testifying, evidence is coming in, the judge is making rulings, the other counsel is making rulings, but he's making that without any ability of Mr. Vang to counsel him on what the evidence is, how he's perceiving this, and maybe assisting him in defending himself. Let me – Can I just ask a question to get some structure here? Yes, Judge. My understanding was there was an interpreter to help counsel and Vang at the start. Yes, Your Honor. There was a court-appointed interpreter, and there have been interpreters through the preliminary hearing procedure and so on up to this point. Okay. And there came a point in time when the State trial judge removed that interpreter. Yes. And there was an objection. Yes, there was, Your Honor. My understanding from reading the record is the judge said at that time and at least one other time, if this presents a problem as the trial goes on, I'll revisit the issue. I'm not using the exact words. Right. But that was the substance of what he said, correct? Well, first what he said – Can we start with a yes or no? Yes, Your Honor. Is that what happened? I believe that that was indicated, yes. That leads me to my last question in this series. Did that ever happen? It did not, Your Honor. Okay. So what do we make of that? Well, I mean, it's either one or two things, Your Honor. First, my view of the judge's sua sponte removing an interpreter without ever having at least – That's not what my question is directed to. What do we make of the fact that the trial judge offered to revisit the interpreter after a counsel table issue if problems occurred during the trial and there was no further objection from the defense table? Ineffective assistance of counsel, Your Honor. Okay. What did you say? Ineffective assistance of counsel. Okay. Now, two things were offered. We'll look at it later. Or if you want to pay for it yourself, we'll allow you to have an interpreter. But – Do I also understand correctly that at some points during the trial, the defendant, Vang, spoke up and attempted to correct the interpretation being made by an interpreter? Yes, Your Honor. What do we make of that? Well, I think it was, as I understand it, he was disagreeing with whatever that interpreter thought, and I think that was when the co-defendant was on. Well, you know, I read that, and I see someone who's now claiming to us that he didn't understand what was going on, who's sitting during a trial, listening to an interpreter in what, Lao? Yes, Your Honor. In Lao, translating that into English, and understanding it so well that he wants to correct the interpreter's interpretation from Lao to English. Now, is this someone that needs help at the counsel table? Well, Your Honor, that happened at the preliminary hearing. That did not happen at the trial. Now, there was a – you know, obviously, that's a less stressful setting, and he maybe had a little better handle on some of the words. I mean, all of us can say that we know a particular word in a language doesn't mean we're sufficiently fluent in that language to communicate an idea or understand it totally. I mean, if he understands – I understand what I told you this morning in Mortlock Eves, but I certainly wouldn't want to get on the stand and testify in that language, because having a lot of experience in translated cases, and as we heard from the other case, the whole thing is stressful. And you have a tendency to revert to your natural language if you're having a translator in your hand. You cannot effectively communicate, especially when you're testifying in your own defense, when there's a lot of rapid-fire cross-examination questions. Now, well, may I – may I say one thing else, Judge August? It should have been revisited, because Mr. Vang, while he was on the stand, asked for a translator. May I have a translation? May I have a – or may I have a – he didn't get the word right, but he asked for it specifically. The judge didn't say anything, the defense attorney didn't say anything, and the prosecutor just went on asking his questions. I mean, to me, it affects so many basic rights in our system for someone to have to go through a trial without understanding completely. I mean, I don't think 50 percent is enough. I don't think 25 percent – I'm not even sure 90 percent is enough, especially if you're trying to convince people that you didn't do something, and the essence of the case is the co-defendant against him. I mean, I don't see how you get around a due process violation there, and I make the – and I make the analogy to competency, and I think this is the exact analogy where we're talking about in DROPE and PATE and those cases. You have to have the ability to – you have to be competent enough, and whether or not it's mentally or through language, to communicate with your counsel not only during trial, but before trial. Otherwise, you can't possibly get effective assistance of counsel. And my view of it is, is when the judge removed that translator without making some kind of factual finding, I mean, if he would have asked, he might have found out that one of the problems is, is that the interpreter was speaking loud instead of mutt. I mean, he could have asked him, what's your problem with the translator? Why isn't he – I mean, that seems to me to be a logical question, that the judge is going to say, I'm removing something that's already been appointed, that's already been determined that you need from this case. And we cited cases in the brief that say that that's neither the judge's nor counsel's right. That's the defendant's right to say whether or not he wants to waive the services of an interpreter. And maybe he might have said that. Well, I'd rather have nothing than somebody just speaking a language I'm not that familiar with. I mean, it's a related language from the same area of the world, but it's not the same language. So how can you sit through that and have a fair trial and actually participate and be present? Because he's really, truly not confident, and that's where we're at. And I think that's exactly what the trial judge should have done. He should have found out, what is the problem here? Before he's suesponed, he says, you're out of here, and let's go on. I thought Feng testified that he actually worked as an interpreter for the culinary union. Yes, he did. He spoke Hmong, Lao, Thai, and English. Enough to help these people. You have to understand that at least the lawyer was there. It looked like his English was okay, except his grammar was no good. Well, you know. He gets tense. You ask this guy for subjunctive pluperfect, he's going to fade out on you. I don't even know what that is myself, Judge. You have to take Latin to get into that stuff. Well, I understand that, Your Honor, but here's the crux of the problem. He's sitting here on the witness stand looking at 12 people. He's trying to speak English. He's not doing it very well, and there's studies that show that people do hold that against you. But the problem is that a lot of his questions or his answers to questions weren't responsive. When he was even answering to his own counsels, the prosecution accused him of having memorized the script, that he wasn't really testifying. He was just saying things that he had memorized in English so he could get up there and say that. I mean, that's in the record. So and then he asked him a question that's not responsive. Unresponsive shows he doesn't understand. Exactly. I don't know if it's there was an old Sid Caesar comedy routine with a lot of double talk, and I'm often reminded of that, or I used to be in practice when people were unresponsive. Well, I'm not sure it's double talk. I mean, well, I mean, it is in a sense because he's saying English words that sound like English words, but they don't have the meaning that needs to be conveyed. And that's the whole thing about Sid Caesar, was that you could he could sit there and make up these words that sounded like German or French or whatever, and it was all nonsense, and I don't see the difference between this. Mr. Bang's up there trying to make English-sounding words, but they don't have the content that he's trying to convey to the jury, and he cannot get a fair trial under our constitutional system without being able to do that. He brought in, the judge told him that you can bring an interpreter. They brought in a Hmong interpreter. He takes a stand, and the judge says, we're not going to need you. Get out of here. Now, again, I mean, there's two problems there. Either the judge interfered with his right to testify on his own behalf, which we don't need to show prejudice to get a reversal on, or counsel was totally ineffective because he didn't understand that his client needed to do this to testify. Are there specific instances where the lack of understanding, precise understanding of language, in your view, prejudiced your client? There's – well, I cited one, Your Honor, and I haven't gone through every one of them, but there's a number of – and here's the problem. Tell us about your best one. Well, the one is the prosecutor asked him, did you give Larry's phone number to Boo? That's the co-defendant. And he says, I don't even know where Boo was living, and I didn't know Boo's number. How do we know that's not responsive? Well, because he asked him, did he give Boo Larry's number? They worked together at the culinary. I mean, well, maybe he assumed he knew Boo's number to call him and tell him that, but that's not what he asked. But what – here's the problem that it presented, Judge. When Mr. Bang didn't understand, then the prosecutor accused him of being evasive. Well, you're not, you know, what about this? What about this? And the effect on the jury is obviously catastrophic in terms of what it – if it's a credibility case, whether or not Mr. Bang is actually trying to hide something from them, when in reality it's the whole basis of it is his lack of understanding of English. Now, on that example, I don't understand it. Did you give Larry's phone number to Boo? I don't know where Larry lives, and I don't know his number. No, I don't know where Boo lives, and I don't know his number. Larry's number to Boo's. I see. See, and the reason that was important, because Larry was the insurance agent that wrote up the insurance policy that supposedly was the center of all this conspiracy to kill one person for the insurance and then another person to cover it up. I got it. Oh, help me on something unrelated, but I don't want to run out of time. We have these obligations under AEDPA to defer to State court reasoned decisions. And I can't find the reasoned decision of the highest State court to rule on this in the excerpts. Where is it? Well, it's in the exhibit when they denied his direct appeal, Your Honor. And on both of them. Just tell me a page of the excerpt so I can tab it. Your Honor, I think it's probably one of the most important statements. Once you get through, look at it and get a little note to the clerk. How worse than that is on direct appeal, they basically dismiss appeals a lot. On habeas, where a lot of this stuff came up, especially the IAC and these things, what the Nevada Supreme Court does is in habeas cases, it does not allow briefing. Does not allow what? Does not allow briefing. And Mr. Vang was unrepresented in the State Supreme Court on the habeas thing. A lot of States, we just get a postcard denial from the Supreme Court. And how they do it is, is when you consider the immediate appellate court or occasionally the trial court, that's the last reasoned decision. I just want to find it, whatever it is. Well, what they said was, is that, I mean, at the highest court in this case in the habeas was, is that we've looked at all his issues, we find him to be without merit. And that's basically it. And that seems to cover everything that he put in it. Yes, sir. Yes, sir. Good morning. If it pleases the Court, my name is Vic Schulze. I'm the Senior Deputy Attorney General for the Warden and the Attorney General of the State of Nevada. You don't happen to have whipped out that page number while you were listening. The document you're looking for is not in the EOR. I'd remind the Court that I filed a motion to strike the opening brief and dismiss the appeal based on the opening brief. It would have been a lot more helpful for you to file a supplemental excerpt of record. We did, Your Honor. I mean, whatever I'm supposed to defer to. The supplemental excerpts of record that I filed were, I think, twice as long, twice the length of the EOR in this case. I've got them right here. Tell me what page number is the State decision I'm supposed to defer to. I don't believe the State decision that you need to refer to is before that. It's the best this panel has, I think, is Judge Prozor. And you didn't put the State decision in the supplemental excerpts? I did not. I included the trial transcript in the supplement. Well, AEDPA says I'm supposed to read the decision of the highest State court to make a reasoned decision on it, and I'm supposed to defer to that under these various standards in AEDPA that are greatly deferential. So you're telling me neither side gave it to me? I don't believe you have that in front of you, no. There's probably the best thing in your case, and I don't have it. I think the – well, the burden is not mine in habeas. The burden is on the other side, and the other side had the obligation under the circuit rules to provide you with a sufficient EOR. But most State assistant AGs give us the decision and they say here's what we're supposed to defer to. Well, it's been a while. What I'm – what I was attempting to do in the supplemental EOR that I filed was to give you the – That wouldn't carry the plaintiff's – the appellant's burden. It would carry yours. We don't have a burden, though, in this case, Your Honor. I think that burden belongs to the appellant in this case to show that what Judge Pro did was incorrect. We think Judge Prozor's order, which was included in EOR, at page 25 is correct. Well, what you're saying is, Judge, I'm not giving you the State decision to defer to. Why don't you just decide de novo whether the State trial judge was correct? Well, that gives me a whole lot more freedom to say he was wrong than if you had given me the State decision that I'm supposed to defer to. We didn't – I can't say that we made an opinion on our side to keep anything from the Court. What we attempted to do was to supplement what the Court had with the trial transcript. Can we just handle this this way? Can you provide us within a reasonable period of time with the State reasoned decision? Absolutely. Absolutely. I would point one – one problem out, though. You don't have to argue about it. Just – Understood. I would – I would point one problem out, though. I don't remember if – I don't remember in which proceeding this issue was dealt with, if at all, by the Nevada Supreme Court, because – keep in mind, this is the second time we're in front of – And we're doing something about AEDPA. I'm sure you will look and find out. I'm sorry? Now that you are more familiar with AEDPA, I'm sure you will look and you will find out what proceeding. My caution is there may not be a ruling on the issue, because the first time we were in front of the Ninth Circuit, prior to that proceeding, I had argued that a number of the claims were unexhausted. Judge Proe had said – and he disagreed with us, and he had said those claims are not unexhausted. He applied a procedural default. Pardon me. When we were in front of the Ninth Circuit, the first time in this case, that was overturned because the Judge Suospati applied that procedural default. I think – I think we understand. It may be that the reasoned decision on the two translator issues is contained in the record, because the only Nevada jurist who spoke directly to it was the State Court trial judge. That may be the case. And if that is the case, just within a reasonable time after the conclusion of argument, tell us that. Sure. But if there's a court of appeals or Nevada Supreme Court decision that addresses the issue, that's what my brother Kleinfeld is asking you about. Absolutely. Absolutely. Okay. I point out that in Judge Proe's order, Judge Proe went to a lot of effort to examine the preliminary hearing and the trial. I don't know if you know this, but we review what the district judge did, de novo. There's no deference whatsoever. Absolutely. For what the district judge did. It's only what the State Court did that we have to look for. Absolutely. Understood. What Judge Proe did was – Judge – when I had filed my answer, I focused on the issue of Vang's ability to speak English. And I think that the trial transcript, Vang's responses to answers both to his own attorney and to the State's attorney on cross-examination show a pretty good, conceitedly, some grammar issues, some verb tense issues in his ability to speak English. But his English was pretty advanced. We spent a lot of time in our answering – in our answer on his ability to speak English. Judge Proe went into a lot of time and effort in that – pardon me, in his order on Vang's concomitant ability to speak Lao because that translator was speaking Lao. And as the court has indicated, the panel members have indicated, Vang went to the preliminary hearing of correcting the Lao translator. Because everything in that trial was translated in English for the benefit of the jury and the judge, we still believe that one primary focal point of the language ability in this case is how good Vang's English was. And I think if you look at the trial transcript – In a capital murder case, why in the world would that judge say, you don't need an interpreter? Go, interpreter. Well, according to – I've never heard of a trial judge doing anything like that. According to the trial transcript – And why in the world – do you know of any other trial judge that's ever sua sponte, kicked off an interpreter, and said to someone from some foreign country like Laos, you don't need an interpreter? I can't cite one to you, but what I – Why on earth would he do that? Because what he said was, he made a record in the trial that we've provided in the SCOR, and what he said was, I've been watching the proceedings from the bench for a day and a half through lengthy capital trial jury selection, through lengthy opening statements, and through a couple of witnesses the first day when witnesses were testifying – I remember all that. And what he said was, you're not translating, you're not doing anything, and I'd also point out that what he did not do, and I think there's been some commentary on this – But what he did do was give us a big issue on appeal. I mean, what was he trying to do, save money? I think what he didn't want simply was to have – I think money may have been an issue, I think the interruption to the trial may have been an issue, and I think it simply may have bothered him that there was a translator there who was sitting at the table who was doing nothing, and he was – he was simply taking up space. But what we do know from the comments of the trial judge, what he was not doing is he was not translating. And we know that – we also know that in addition to removing that – the translator, the loud translator, he simply didn't tell the guy, you're removed. What he said was, he's willing to revisit this issue any time there's a problem. He was open to demonstrations that Vang could not speak English. When Vang took the stand, Vang demonstrated that he could speak English fluently. Again – Not fluently. Well, I would say fluently. Some – there were a couple of issues with verb tenses. His English was very broken. His English was – I think his accent came through, but I do not think he had – I don't think the trial transcript demonstrates that he had any problem understanding questions. Let me give you a specific example of something he did not request, something he did not understand. He didn't understand the term apartment complex. Somebody used the term apartment complex. Like the few other examples, and there might have been five or six examples in 160 pages of testimony, there might have been five or six examples where he said, I don't understand your question. But of course, native English speakers do the same thing when you get into a convoluted question by an attorney. Happens all the time when somebody says, I don't understand your question. When the prosecutor explained that the term apartment complex meant your apartment building, then he answered the question. Counsel referred to the one example when Vang said, I need something translated. It was translated. It was explained to him in – let me rephrase. It was not translated. It was explained to him in English, and he went on and answered the question. A review of the trial transcript seems to show, and I think both – I think the trial judge was aware of this, but I think Judge Proh went through this when he filed – when he entered his order in this case. Every time Vang had a question, and it was fewer than 10 times in 160 pages, those issues were explained to him in English, and they moved on. And so there didn't seem to be more of a problem that he was having than a native English speaker would have. Let's assume that a translator sitting at counsel table in a week-long trial only actually translates three, four, or five times. We don't know whether those were three or four unimportant times or important times, but that's all the translator does. The rest of the time, the translator is sitting there waiting if there is a problem with understanding what's going on. Following on Judge Prakerson's question, what's the problem with that? What's the problem with maintaining the interpreter? With keeping the person there. Is it a matter of economics? I don't know that I can say there's a – Or is it the concern on the part of the trial judge that maybe the defense is getting an undue advantage? I don't know. I'd be speculating. There's a possibility if you have a defendant who speaks English, who is from a foreign country, and you go through the effort of having translators in the courtroom, maybe there's a feeling on the part of the attorney that that's really just window dressing to create sympathy for that defendant. That's a possibility. But again, I'm speculating because they didn't make a record on that point. What attorney are you talking about? The defense counsel? You want the interpreter there just to create sympathy for his client? I'm sorry? Are you saying the defense counsel would want the interpreter there to create sympathy for the defendant? I think that's a possibility, but I'm speculating because we don't have a record on that. I'm sorry? You know, and don't forget the attorney is there. We're talking about when you have witnesses other than the defendant. The attorney is there. He hears. He's listening. He's making notes. He knows what's important, presumably, and what isn't. And this is something he can discuss with his client later on. He doesn't want to stop everything and then have this interpreter in between the two. You know, that sometimes can make communication difficult. So he's writing all this down, and he can get together with his client later on. That absolutely could be. This interpreter, what dialect did he speak? He spoke the language of Lao. I don't know anything about a dialect. Well, you know, there are different dialects. And you can speak the language of Lao, and you have this dialect, you have that dialect. I mean, I've had cases involving Armenians. You know, an Egyptian Armenian who's an interpreter is not very helpful to a Turkish, to an Armenian who just fled Turkey. Makes sense. Yeah. See? I've got a follow-on question, and that is, there was no evidentiary hearing at the district court level? No. So there was no opportunity to put on expert testimony or to test Vang's comprehension of English and need for a translator? In an evidentiary hearing, there was not. But as Judge Pro found in his order that was filed denying this claim, he said that the district court judge did something better than hold an evidentiary hearing. He had what he called, what Judge Pro called, a real-world hearing actually observing the court proceedings. I'd point out that when Judge, when the state district court judge dismissed that interpreter and then said, but I'll revisit the issue if you can demonstrate a linguistic problem here, which never came up. I understand. I'm not suggesting that an evidentiary hearing was required necessarily. But there was no evidentiary hearing. There was none. So there was no opportunity to test in any kind of expert way Vang's comprehension. Yes, that's correct. There was none. I'd point out that your decision that's cited in the public defender's brief at Mayan's decision from the Ninth Circuit overturned a somewhat similar situation, except in that situation, apparently, a district court judge dismissed an interpreter before the witness had ever testified at all and basically just kept telling the witness, why don't you try it? Why don't you try to testify in English? Let's see how it goes. And dismissed him without any track record, if you will, on the ability of that defendant to speak English. What the Mayan's court, what the Ninth Circuit said in the Mayan's decision was, the best thing a district court judge can do is to observe the ability of that defendant at trial to speak English. The court's observations are what's most important. How do you observe the ability of someone to speak English if you're not there listening to them? I wasn't down there with defense counsel listening to what went on between the two. Because what he was observing was the fact that there was no translation going on, and it was apparent to him watching those proceedings for a day and a half, in a pretty complicated proceedings, jury selection, opening statements, and some witness testifying, that there was no translating going on. What he said was, you're not doing any translating. Why are you here? So this judge was actually able to follow what the Ninth Circuit said in Mayan's, was to observe the proceedings. I'd also point out that when the dismissal order came down, the judge said, I've been observing you for a day and a half, and I haven't seen any interpreting going on. Lead counsel said, well, Your Honor, I can't dispute your observations, because I haven't been making the same observations that you have, because I've been busy at counsel table listening to the testimony. And so even counsel had to concede that the judge had the ability to see things and to observe the courtroom situation in a way that nobody at counsel table did. An experienced judge. I think we have to assume that this judge knew what he was doing. He knew something about running a trial. I don't think anybody disputes that. And, you know, I don't think that this is a decision that a court makes lightly. At this level, we're just a little curious. I think everybody would concede that Vang did not have 100 percent comprehension of English. May have been 95, may have been 90, may have been 80, may have been 70. But what do we know happens in the gap? What's missed in the gap? Right. We just don't know that. I think the issue in looking at Judge Proh's order, the issue here is whether or not the petitioner in this case can show that there was real error in what the district court did. Could there have been some word, perhaps, statement, a question that might have been clarified to Vang? It's a possibility. But if you look at the totality of the circumstances, Vang's testimony, the fact that there was no translating going on, no interpreting going on, seems pretty obvious, at least to the State respondents in this case, that Vang's English was good enough to give him a fair trial in this case. You're saying we should review De Novo? I'm sorry? You're saying we should examine at De Novo? Judge Proh's order. Absolutely. That's the standard on habeas review from the district court. Including his decision not to have an evidentiary hearing. I'm sorry? Including Judge Proh's decision not to have an evidentiary hearing. Yes. Because what Judge Proh said, again, what Judge Proh specifically said on the language issue was something better than an evidentiary hearing happened here, and that was the district court's, similar to the Mayans' decision, Judge Proh's real-world ability to observe the lack of interpretation that was going on. I think you meant the district, the State's. I'm sorry, you're right. Judge Proh reviewing the State trial record, and that State trial judge being able to observe those proceedings. I'll also point out that it turns out in our view that what that trial judge did was correct, in that Vang's testimony both to his attorneys, a lot of times which allowed him to launch into speeches that may or may not have been relevant to get cross-examination, and things got pretty hot at different times. During that cross-examination period, there was never a situation where Vang was lost. When he wanted a word or a question explained to him, and it was explained to him, it was explained, he understood it, he went on. There was never a point in the trial proceedings when he was testifying that he got lost and could not follow those proceedings based on what was, pardon me, what was happening with his use of language. I would suggest to you that he's got an accent. At some point, he's got some verb tense confusion, but nothing substantial. Was there a tape recording made of the proceedings, the trial proceedings, when Vang was on the stand? I don't know. I would, my recollection of State court process is if there was a reporter taking it down, that there would not have been a recorder. I think it's one or the other. They've got tape recorders. Yeah. I don't know. This trial was 20 years ago. It was 1986. And I don't know what the proceedings were in 1986. I would assume not. 1986? That's not so long ago, is it? I don't know. 20 years? Yeah. I don't know. I'm guessing if it was reported, it probably was not recorded. You never checked on this? I did not, no. I did not. Okay. Thank you very much. All right. Thank you, counsel. Just on the highest court, I can say that I know in the direct appeal it wasn't decided because one of our claims is ineffective assistance on appeal for not raising that. And the other one, Your Honor, is that the ineffective issue did not come up in direct appeal in the Nevada Supreme Court because one of our issues is that the appellate counsel was ineffective for not bringing that up. I see. All right. The habeas decision by the Nevada Supreme Court is at our Exhibit 104 in the clerk's record, which, as we pointed out in the motions things, all of those files, including our voluminous exhibits, were shipped to the court during the first appeal. And apparently they're still here. And that was one of the reasons we didn't bother sending them up again, because apparently Judge Crowe didn't get them back, so he asked the State to produce another set of these for him. But as far as I understand, those are now here in storage and in this Exhibit 104 attached to our original opinion. On this interpreter issue. Yes, Your Honor. You can't do a Federal habeas unless you exhausted the issue in State court. Correct, Your Honor. That means it must have been exhausted on the prisoner's habeas in State court. Exactly, Your Honor. His State court post-conviction relief. So there must have been a decision about it. And that's what Van Goren found, Your Honor, the first case. Your opponent would ordinarily want us to defer to that decision under AEDPA, but evidently dropped the ball on it. I think the actual only ruling. I think we still have to defer to it. I think the only actual ruling we have, Judge Conto, is what Judge White did at the State trial court. And that little interchange we had. That's going to be it. That's it. So the State appellate court said what the State trial judge did, that's right. Basically, they said, as they do in their habeas cases, they drop a footnote at the end. We've looked at all issues and we find it to be without merit, period. And there's no, when a habeas matter goes up to the Nevada Supreme Court, what goes up with it? Are there briefs filed, exhibits filed? Well, in habeas, no, unless the court specifically asks for briefs, no, briefs are not filed. Counsel is not appointed. And what they do is they ship the complete record from the State trial court to the Nevada Supreme Court because we don't have an intermediate court of appeals. So everything goes up to that and they look at it and they say it's without merit and enter their basic summary order. So the highest State court is the State trial judge? In this instance, yes. And we don't know where those records are. Do you think they may be in this building? They're stored here, Judge, according to the docket sheet. It's on the docket sheet from the very first Vang thing which is attached to our order when they were shipped up, all of our exhibits, which were over a hundred and some attached to our original petition, were shipped up separately to, in the first appeal that we came up on the procedural questions. And it shows on the docket sheets they were placed in storage here and they never were transmitted back to the district court in Nevada. Was anybody called the clerk here to find out where they are? No, Your Honor, I didn't. Well, why don't you just walk over to the clerk's office and ask them? You know, we have all this shifting of documents going back and forth. I understand that. A lot of documents. And sometimes we get the full State court records. Sometimes we don't. What's really usable for us is the excerpts. Yes, sir. We get multiple copies. We can mark them up and tab them. Yes, Your Honor. All right. Thank you very much. We'll go to U.S. v. Rodriguez. We've got to reassemble. Oh, we've got to reassemble. All right. We're going to take a recess. All right. This court stands recessed for five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Five minutes. Two minutes. Two minutes. Two minutes. Two minutes. Two minutes.
judges: Pregerson, Kleinfeld, Hawkins